IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

JENNIFER K. MINNEY,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

    Defendant.

No. C13-0037

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................... 2

II.    PROCEDURAL BACKGROUND ........................... 2

III.   PRINCIPLES OF REVIEW ................................. 3

IV.   FACTS ..................................................... 5
    A.   Minney's Education and Employment Background ............ 5
    B.   Administrative Hearing Testimony ........................ 5
        1.   Minney's Testimony ............................... 5
        2.   Vocational Expert's Testimony ...................... 6
    C.   Minney's Medical History ............................... 7
        1.   History of Hospitalizations ......................... 7
        2.   Opinions of Treating Sources, Examining Doctors, and Non-
           Examining Doctors .............................. 11
           a.   Treating Source Opinions .................... 11
           b.   Opinions from Consultative Examining Doctors ..... 12
           c.   Opinions from Non-Examining Agency Doctors ..... 14

V.    CONCLUSIONS OF LAW ................................ 16
    A.   ALJ's Disability Determination ......................... 16
    B.   Objections Raised By Claimant ......................... 18

VI.   CONCLUSION ........................................... 24

VII.  ORDER ................................................. 24

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Jennifer K. Minney on April 12, 2013, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Minney asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Minney requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On February 23, 2010, Minney applied for disability insurance benefits; and on March 5, 2010, she applied for SSI benefits. In both applications, Minney alleged an inability to work since February 27, 2007 due to bipolar disorder and borderline personality disorder. Minney's applications were denied on June 17, 2010. On October 11, 2010, her applications were denied on reconsideration. On November 17, 2010, Minney requested an administrative hearing before an Administrative Law Judge ("ALJ"). On February 8, 2012, Minney appeared via video conference with her attorney before ALJ Eric S. Basse for an administrative hearing. Minney and vocational expert Carma A. Mitchell testified at the hearing. In a decision dated May 18, 2012, the ALJ denied Minney's claims. The ALJ determined that Minney was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Minney appealed the ALJ's decision. On February 11, 2013, the Appeals Council denied Minney's request for review. Consequently, the ALJ's May 18, 2012 decision was adopted as the Commissioner's final decision.

On April 12, 2013, Minney filed this action for judicial review. The Commissioner filed an Answer on August 12, 2013. On September 20, 2013, Minney filed a brief

arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing other work that exists in significant numbers in the national economy. On November 19, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On July 1, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary

outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Minney's Education and Employment Background

Minney was born in 1979. She is a high school graduate. She also took classes in phlebotomy through vocational rehabilitation. Among other jobs, Minney spent some time working as a phlebotomist.

The record contains a detailed earnings report for Minney. The report covers the time period of 1994 to 2011. From 1994 to 2007, Minney earned between $1,076.61 (1994) and $13,266.26 (1998). She has no earnings since 2008.

### B. Administrative Hearing Testimony

#### 1. Minney's Testimony

At the administrative hearing, Minney discussed her difficulties with borderline personality disorder. Minney testified she has been hospitalized on several occasions due to her mental health problems. She also stated that one of her coping mechanisms for her mental health difficulties is cutting. Additionally, Minney's attorney inquired about Minney's suicidal thoughts:

> Q:  I know -- we've gotten several of your treating doctors to provide us information about your symptoms. They're talking about frequent thoughts of suicide. Does that go through your mind all the time?
>
> A:  . . . Unfortunately it is. Everyday is a fight. You know, your mind says, you know, it's a bad thing and you shouldn't kill yourself, you shouldn't feel depressed. But your heart -- your heart just --

(Administrative Record at 55.) Minney also testified she tries to do work around the house, such as cooking and cleaning, but has difficulty concentrating and staying on task.

She also stated that her mood and physical well-being plays a role in her ability to do household chores.

## 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Carma A. Mitchell with a hypothetical for an individual who:

> is capable of performing tasks that could be learned in 30 days or less involving no more than simple work-related decisions with few workplace changes, can have only brief and superficial interaction with the public and coworkers and no interaction with a supervisor.

(Administrative Record at 69-70.) The vocational expert testified that under such limitations, Minney could perform her past relevant work as a laborer, or perform the job of marker (2,000 positions in Iowa and 186,000 positions in the nation). The ALJ provided the vocational expert with a second hypothetical for an individual who:

> [is] capable of only sedentary work . . . [and] can perform tasks that can be learned in 30 days or less involving no more than simple work-related decisions with few workplace changes; again, can have only brief and superficial interaction with the public and coworkers and occasional interaction with supervisors; should avoid exposure to pulmonary irritants -- at least concentrated exposure to pulmonary irritants[.]

(Administrative Record at 72-73.) The vocational expert testified that under such limitations, Minney could not perform her past relevant work, but could perform the following sedentary jobs: (1) document preparer (300 positions in Iowa and 32,000 positions in the nation), (2) addresser (200 positions in Iowa and 25,000 positions in the nation), and (3) surveillance systems monitor (200 positions in Iowa and 33,000 positions in the nation).

Minney's attorney also questioned the vocational expert:

Q: If a hypothetical person is not able to maintain concentration in two hours -- for two-hour segments, are they competitively employable?

A: No, it'd be my understanding the person wouldn't be able to complete tasks, you know, to continue at that. So no, they would not be able to.

Q: If the hypothetical person needed to take frequently unscheduled rest breaks at various times for various lengths of time, 15 to 30 minutes each; two, three, four times a day, would an employer allow for that much absenteeism from the work setting?

A: No, it would not be tolerated and they could not perform full-time competitive employment.

Q: What if the hypothetical person had to work at a slow pace up to a third of the workday? Would they be competitively employable?

A: No they would not.

(Administrative Record at 72.)

### C. Minney's Medical History

#### 1. History of Hospitalizations

On September 19, 2002, Minney was admitted to St. Luke's Hospital in Cedar Rapids, Iowa, because she "ran out of medications for bipolar illness and was irritable and difficult to deal with at her parent's home."[1] Dr. Collyer M. Ekholm, M.D., also noted that Minney was having difficulty sleeping at night. Minney was given multiple medications as treatment, and was discharged from the hospital on September 23, sleeping "well" at night and no longer irritable.

On July 27, 2003, Minney was admitted to St. Luke's Hospital in conjunction with a drug overdose. When she was admitted, Dr. James L. Justice, M.D., noted that "[y]esterday [Minney] woke-up and decided she wanted to commit suicide, that was her

---

[1] Administrative Record at 339.

description of the situation so she took a bunch of her pills[.]"[2] She was treated with medication, and discharged from the hospital on July 30.

On April 5, 2004, Minney was again admitted to St. Luke's Hospital for a drug overdose. Dr. Ali Safdar, M.D., noted that Minney reported feeling depressed and was "not doing well." Dr. Safdar diagnosed Minney with bipolar affective disorder and borderline personality disorder. She was treated with medication, and discharged from the hospital in stable condition on April 8.

On July 11, 2004, Minney was admitted to St. Luke's Hospital feeling depressed and reporting suicidal thoughts. Minney also indicated that she had not slept in 3 to 4 nights. Dr. Safdar noted that Minney "was in a quite depressed mood, irritable and had insomnia on admission."[3] Dr. Safdar diagnosed Minney with bipolar affective disorder, depression, and borderline personality disorder. She was treated with medication, and discharged as "improved" at her own request on July 13.

On July 25, 2004, Minney was again admitted to St. Luke's Hospital feeling "incredibly depressed." She also reported hallucinating and cutting herself. Dr. Safdar diagnosed Minney with bipolar affective disorder with depression and borderline personality disorder. At the time of admission, her assessed GAF score was 30. Minney was treated and discharged on July 27.

On September 22, 2004, Minney was admitted to St. Luke's Hospital feeling depressed, moody, irritable, and reporting suicidal thoughts. Dr. Safdar noted that she had been "noncompliant with her outpatient treatment."[4] Dr. Safdar diagnosed Minney with bipolar affective disorder and borderline personality disorder. She was treated with

---

[2] *Id.* at 607.

[3] *Id.* at 793.

[4] Administrative Record at 949.

medication, support, and therapy. On September 27, Minney was discharged as "improved."

On February 11, 2005, Minney was again admitted to St. Luke's Hospital with a depressed mood, irritability, and suicidal ideation. She also reported "being under a lot of stress."[5] Dr. Safdar diagnosed Minney with bipolar affective disorder and borderline personality disorder. She was treated with medication, and discharged on February 16.

On March 22, 2006, Minney was admitted to Mercy Medical Center in Cedar Rapids, Iowa, complaining of feelings of paranoia, hearing things, moodiness with racing thoughts, and difficulty sleeping. Dr. Safdar noted that Minney "stopped taking her Lithium four months ago. She stopped taking her Seroquel a month ago. She has not slept for the past 32 hours."[6] Dr. Safdar diagnosed Minney with bipolar affective disorder and borderline personality disorder. Dr. Safdar assessed a GAF score of 35 for Minney. She was treated with medications, and discharged on March 25.

On November 28, 2006, Minney was admitted to Trinity Medical Center in Moline, Illinois, for "a bout of illness associated with suicidal ideation [and] self-mutilation[.]"[7] Dr. Ralph Saintfort, M.D., diagnosed Minney with major depressive disorder, generalized anxiety disorder, and borderline personality disorder. Dr. Saintfort assessed a GAF score of 60 for Minney. She was treated with medication and therapy, and discharged on December 1.

On October 2, 2009, Minney was admitted to Tarrant County Hospital in Fort Worth, Texas, with suicidal ideation. Dr. Linda Audrey Asante-Ackuayi, M.D., noted that Minney:

---

[5] *Id*. at 1058.

[6] *Id*. at 1082.

[7] Administrative Record at 1087.

> has a history of bipolar disorder and reportedly has been
> depressed for the past 6 months which worsened over the last
> month. She has not been taking her medications. [Minney] is
> brought to the [hospital] accompanied by her sister-in-law who
> was concerned over material the patient had printed and posted
> on her facebook online. [Minney] admitted to decrease in her
> sleep, interest level, energy level, concentration, and appetite.
> She also states that she had guilty feelings. . . . She was sad
> and had suicidal ideations.

(Administrative Record at 1190.) Dr. Asante-Ackuayi diagnosed Minney with bipolar disorder with depression and borderline personality disorder. Her GAF score was assessed at 40. Minney was treated with medication, and discharged on October 5. At the time of discharge, her GAF score was 55.

On December 2, 2010, Minney was admitted to St. Luke's Hospital for "feeling moody, irritable, depressed, not sleeping and thinking about cutting herself or taking a drug overdose."[8] Dr. Safdar diagnosed Minney with mood disorder and borderline personality disorder. She was treated with medication, and discharged on December 5.

On July 28, 2011, Minney was admitted to St. Luke's Hospital for "irritability, mood swings, agitation, and some suicidal ideation. She was also hearing things."[9] Dr. Safdar diagnosed Minney with mood disorder and borderline personality disorder. She was treated with medication, and discharged on July 31.

On November 30, 2011, Minney was again admitted to St. Luke's Hospital for "feeling depressed, moody, irritable, and not sleeping well. She was reporting suicidal thoughts."[10] Dr. Safdar diagnosed Minney with bipolar disorder and borderline personality disorder. She was treated with medication, and discharged on December 3.

---

[8] Administrative Record at 1400.

[9] *Id.* at 1404.

[10] *Id.* at 1401.

### 2. Opinions of Treating Sources, Examining Doctors, and Non-Examining Doctors

#### a. Treating Source Opinions

On September 14, 2010, at the request of Minney's attorney, Dr. Safdar, Minney's treating psychiatrist, filled out a "Mental Impairment Questionnaire" for Minney. Dr. Safdar diagnosed Minney with bipolar disorder and borderline personality disorder. Dr. Safdar assessed Minney's GAF score at 45, with a high score of 50 for the past year. According to Dr. Safdar, Minney's medication caused drowsiness, fatigue, and lethargy. Minney's signs and symptoms included: thoughts of suicide, mood disturbance, difficulty thinking and concentrating, paranoid thinking and inappropriate suspiciousness, emotional withdrawal and isolation, hallucinations and delusions, manic syndrome, illogical thinking, easy distractibility, and sleep disturbance. Dr. Safdar opined that Minney was seriously limited, but not precluded from performing the following activities: (1) maintaining attention for two-hour segments; (2) maintaining regular attendance and being punctual within customary tolerances; (3) sustaining an ordinary routine without special supervision; (4) working in coordination with or proximity to others without being unduly distracted; (5) completing a normal workday and workweek without interruptions from psychologically based symptoms; (6) performing at a consistent pace without an unreasonable number and length of rest periods; (7) accepting instructions and responding appropriately to criticism from supervisors; (8) getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (9) responding appropriately to changes in a routine work setting; (10) dealing with normal work stress; (11) understanding and remembering detailed instructions; (12) carrying out detailed instructions; (13) setting realistic goals or making plans independently of others; (14) dealing with stress of semi-skilled and skilled work; (15) maintaining socially appropriate behavior; and (16) traveling in unfamiliar places. Dr. Safdar further determined that Minney had the following limitations: moderate restriction of activities

of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Safdar also opined that Minney would have four or more episodes of decompensation lasting at least two weeks during a 12-month period. Lastly, Dr. Safdar opined that Minney would be absent from work for more than 4 days each month due to her impairments or treatment for her impairments.

On November 23, 2010, at the request of Minney's attorney, Carla Levi, LISW, Minney's treating therapist, filled out a "Mental Impairment Questionnaire" for Minney. Levi diagnosed Minney with bipolar disorder and borderline personality disorder. Levi assessed Minney's GAF score at 58, with a high score of 60 for the past year. Levi identified the same signs and symptoms for Minney as Dr. Safdar. Levi opined that Minney's abilities were limited, but satisfactory in the following areas: (1) interacting appropriately with the general public; (2) maintaining socially appropriate behavior; (3) adhering to basic standards of neatness and cleanliness; and (4) using public transportation. Levi determined that Minney had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Levi also opined that Minney would have four or more episodes of decompensation lasting at least two weeks during a 12-month period. Lastly, Levi opined that Minney would be absent from work for more than 4 days each month due to her impairments or treatment for her impairments.

### b. *Opinions from Consultative Examining Doctors*

On April 27, 2010, Minney met with Dr. Abha Saxena, M.D., for a disability examination. Dr. Saxena reviewed Minney's medical history:

> [Minney] reports that she has been testing for bipolar, PTSD, OCD and paranoia since 2002. Before that she was doing well. At that time her ex-husband tried to kill her and since

> then she's become paranoid and has developed a personality disorder and is not able to work. She had a job until then for a long time, but since has [been] on and off [] jobs and since 2007 has not worked. She has been hospitalized for suicidal ideation . . . secondary to psychiatric issues. . . . She especially doesn't want to go out among people as she is scared of her ex-husband.

(Administrative Record at 1276.) Upon examination, Dr. Saxena opined that Minney "avoids social events, avoids people and mostly stays at home with her daughter."[11] Dr. Saxena concluded that Minney is "not able to work but this should be confirmed by the psychiatric notes which I do not have with me right now."[12]

On May 12, 2010, Minney met with Dr. Barbara J. Lips, Ph.D., for a psychological evaluation. Upon examination, Dr. Lips diagnosed Minney with mood disorder and borderline personality disorder. Specifically, Dr. Lips opined that "[i]t seems likely that Borderline Personality Disorder does represent an appropriate primary diagnosis for this individual. It also appears apparent that a mood disorder, whether of a bipolar or major depressive quality, is present."[13] Dr. Lips assessed Minney with a GAF score of 62. Lastly, Dr. Lips determined that Minney had the following mental limitations on work-related activities:

> Ms. Minney appears able to remember and understand instructions, procedures, and locations of at least moderate complexity. She appears able but likely to be inconsistent in maintaining attention, concentration, and pace in order to carry out instructions at a level of expectation. She would be somewhat impaired in being able to interact appropriately with supervisors, coworkers, and the public. She appears to have

---

[11] Administrative Record at 1278.

[12] *Id.*

[13] Administrative Record at 1284.

some difficulty with exercising good judgment, and she may
have some difficulty adjusting to changes in the workplace.

(Administrative Record at 1284.)

### c. *Opinions from Non-Examining Agency Doctors*

On June 15, 2010, Dr. Scott Shafer, Ph.D., reviewed Minney's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Minney. On the Psychiatric Review Technique assessment, Dr. Shafer diagnosed Minney with bipolar disorder, mood disorder, and borderline personality disorder. Dr. Shafer determined that Minney had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Shafer determined that Minney was moderately limited in her ability to: maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. Dr. Shafer concluded that:

> [Minney] has a severe mental impairment that does not meet
> or equal a referenced listing. This is based on the following
> observations. [Minney] was able to obtain and perform
> employment in the past. [Medical evidence of record]
> indicates that her mental status is currently stabilized on
> medication and with treatment. [Examining source] indicated
> some limitations, but none that would preclude employment.
> [Activities of daily living] indicate [Minney] provides care for
> her child, can participate in her daily responsibilities, and
> negotiate the community independently. [Minney] retains the
> ability to understand, remember, and follow simple to mildly

complex instructions. Her attention, concentration, and pace may vary. She can interact appropriately with others on at least a limited basis and her judgment is adequate to adjust to changes in the workplace with some added supervision.

(Administrative Record at 1157-1158.)

On October 11, 2010, Dr. Sandra Davis, Ph.D., reviewed Minney's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Minney. Dr. Davis diagnosed Minney with a history of major depressive disorder, bipolar disorder, mood disorder, history of generalized anxiety disorder, and borderline personality disorder. Dr. Davis determined that Minney had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Davis determined that Minney was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Davis concluded that:

> In summary, [Minney] has some limitations in understanding and carrying out detailed tasks, keeping to a reliable work schedule, sustaining attention/concentration/and pace for a full workday and workweek, traveling in unfamiliar areas, and being easily distracted by others.

> The medical evidence is relatively consistent. There are no
> significant challenges to the credibility of [Minney's]
> allegations.

(Administrative Record at 1348.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Minney is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the
> claimant has a severe impairment, (3) whether the impairment
> meets the criteria of any Social Security Income listings,
> (4) whether the impairment prevents the claimant from
> performing past relevant work, and (5) whether the
> impairment necessarily prevents the claimant from doing any
> other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful
> activity. If so, the claimant is not disabled. Second, the ALJ
> determines whether the claimant has a severe medical
> impairment that has lasted, or is expected to last, at least

12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Minney had not engaged in substantial gainful activity since February 27, 2007. At the second step, the ALJ concluded from the medical evidence that Minney has the following severe impairments: mood disorder, bipolar affective disorder, borderline personality disorder, and obesity. At the third step, the ALJ found that Minney did not have an impairment or

combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Minney's RFC as follows:

> [Minney] has the residual functional capacity to perform sedentary work . . . except: she can perform tasks that can be learned in 30 days or less, involving no more than simple work-related decisions and few workplace changes. She can have up to brief and superficial interaction with the public and coworkers, and occasional interaction with supervisors. She should avoid concentrated exposure to pulmonary irritants.

(Administrative Record at 22.) Also at the fourth step, the ALJ determined that Minney was unable to perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Minney could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Minney was not disabled.

## B.  Objections Raised By Claimant

Minney argues that the ALJ failed to properly evaluate the opinions of her treating psychiatrist, Dr. Safdar. Specifically, Minney argues that the ALJ's reasons for discounting Dr. Safdar's opinions are not supported by substantial evidence in the record. Minney concludes that this matter should be remanded for further consideration of Dr. Safdar's opinions.

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has

offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'*Id..*); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear

to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

Furthermore, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Additionally, an ALJ is not required to "seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (citation omitted). An ALJ should only contact a treating physician "if the doctor's records are 'inadequate for us to determine whether the claimant is disabled' such as 'when the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.'" *Goff*, 421 F.3d at 791 (citing 20 C.F.R. §§ 404.1512(e) and 416.912(e)).

In his decision, the ALJ addressed the opinions of Dr. Safdar as follows:

> On September 14, 2010, Ali Safdar, M.D., [Minney's] treating psychiatrist opined that [Minney] has moderate limitations in activities of daily living, social functioning, and in maintaining concentration[,] persistence and pace. Dr. Safdar indicated that [Minney] has experienced four or more episodes of decompensation, each of extended duration, and that due to her symptoms, she would miss work more than four days per month. The undersigned has considered this

opinion as Dr. Safdar is [Minney's] treating psychiatrist; however, little weight is granted to this opinion, as the opinion is inconsistent with [Minney's] own reports regarding her activities of daily living. Dr. Safdar's opinion regarding [Minney's] level of functioning is also inconsistent with his own treatment notes, which indicate that at the time of his opinion, [Minney] had a Global Assessment of Functioning (GAF) of 62, not the GAF of 45 listed on his opinion statement.

(Administrative Record at 25.)

In reviewing the ALJ's decision, the Court bears in mind that an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quotation omitted). Furthermore, if an ALJ rejects the opinions of a treating physician, the regulations require that the ALJ give "good reasons" for rejecting those opinions. *See* 20 C.F.R. § 404.1527(d)(2). Lastly, if a crucial issue is undeveloped, the ALJ should recontact the treating physician for clarification of the issue. *Stormo*, 377 F.3d at 806.

While this is a close issue, the Court finds that the ALJ has not fully met these requirements. First, the ALJ simply provided a generic and conclusory statement that Dr. Safdar's opinions are "inconsistent with [Minney's] own reports regarding her activities of daily living."[14] The ALJ offers little or no discussion of Minney's activities of daily living in his decision. More significantly, the ALJ failed to explain how or why Minney's activities of daily living are inconsistent with Dr. Safdar's opinions. Second, the ALJ correctly points out that "Dr. Safdar indicated that [Minney] has experienced four or more episodes of decompensation, each of extended duration, and that due to her symptoms, she

---

[14] Administrative Record at 25.

would miss work more than four days per month," but failed to address, let alone offer even one single reason why Dr. Safdar's opinion on the issue of decompensation should be disregarded. Furthermore, Dr. Safdar's opinions regarding decompensation are consistent with the opinions of Carla Levi, another treating source, on the issue of decompensation.[15] Moreover, the medical record clearly shows that Minney has a history of hospitalizations lasting several days at a time due to her mental health problems.[16] Accordingly, the Court finds that the ALJ's failure to address Dr. Safdar's and Levi's opinions regarding decompensation suggests that a crucial issue was undeveloped. Thus, further clarification from Dr. Safdar is proper. *See Stormo*, 377 F.3d at 806.

Lastly, the Court agrees with the Commissioner that following the 2013 publication of the 5th edition of the Diagnostic and Statistical Manual ("DSM-5"), the Social Security Administration did not prohibit ALJs from considering GAF scores; but instead, instructed ALJs to consider GAF scores in the same manner as they consider medical opinion evidence. *See* Social Security Administration, Administrative Message AM-13066, *Global Assessment of Functioning (GAF) Evidence in Disability Adjudication* (July 23, 2013) (providing guidance to ALJs on the consideration of GAF score evidence following the publication of DSM-5). However, given Minney's history of multiple hospitalizations due to mental health problems, and opinions from two treating sources that Minney would have four or more episodes of decompensation lasting at least two weeks during a 12-month period, and would be absent from work for more than 4 days each month due to her impairments or treatment for her impairments, the Court concludes that the ALJ's

---

[15] *See* Administrative Record at 1374-1375 (Levi opining that Minney would have four or more episodes of decompensation lasting at least two weeks during a 12-month period, and would be absent from work for more than 4 days each month due to her impairments or treatment for her impairments).

[16] *See* section *IV. C. 1* above, outlining Minney's history of multiple hospitalizations due to mental health problems.

submission of one inconsistent GAF score is an insufficient reason, standing alone, to completely discount the opinions of Dr. Safdar.

Therefore, the Court finds that remand is appropriate for further development of Dr. Safdar's opinions. Accordingly, the Court finds that on remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Safdar's opinions and support his reasons with evidence from the record. Additionally, on remand, the ALJ must recontact Dr. Safdar in order to clarify his opinions on any undeveloped crucial issues.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to fully and fairly develop the record with regard to the opinions of Dr. Safdar.

## VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ shall fully and fairly develop the record with regard to the opinions of Dr. Safdar, and provide clear reasons for accepting or rejecting Dr. Safdar's opinions and support his reasons with evidence from the record. Additionally, if there are any crucial undeveloped issues pertaining to Dr. Safdar's opinions, then the ALJ must recontact Dr. Safdar in order to clarify his opinions

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this ____ day of March, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA